**Judy NICHOLS, d/b/a Past Painted Petal, Plaintiff–Respondent,**

**v.**

**PREFERRED RISK GROUP, Defendant–Appellant.**

**No. 23447.**

Missouri Court of Appeals, Southern District, Division Two

May 2, 2001.

Michael J. Tubbesing and Laurel Stevenson, Franke & Schultz, P.C., Kansas City, MO, for Appellant.

Connie J. Clark, Osage Beach, MO, for Respondent.

ALMON H. MAUS, Senior Judge.

By her petition in this action Plaintiff–Respondent Judy Nichols, d/b/a Past Painted Petal, seeks recovery against Defendant–Appellant Preferred Risk Group for damage to insured property by fire. The affirmative defenses submitted were failure to submit to questions under oath, failure to cooperate, and arson by or on behalf of the insured. A jury returned a verdict for the plaintiff for $160,000, the face amount of the policy, plus prejudgment interest.

In this opinion the Plaintiff–Respondent will be referred to as Insured. The policy under which recovery was sought was issued on October 8, 1992, by Ansvar. Between that date and the date of trial, the obligation of the insurer under the policy had been successively assumed by three different insurers, the last being the Defendant–Appellant. In this opinion the term "Insurer" will include the insurance company obligated under the policy at the time of the event referred to.

In its brief the Insurer, by six of the seven points presented, asserts the judgment must be reversed because of trial errors by the trial court. The seventh point concerns the calculation of prejudgment interest. The statement of facts in the brief of Appellant Insurer consists of a "General Overview" of nine lines reciting some facts favorable to the Insurer's contentions. This is followed by an abbreviated statement of each of its seven points on appeal, each statement being followed by a recitation of some facts which support that point.

"Apropos of plaintiffs' brief on appeal, we observe, sua sponte, that the 'Statement of Facts' section is written in disregard of the mandate of Rule 84.04(c) ...," *Moore v. Rollmo Corp.*, 575 S.W.2d 859, 860–61 (Mo.App.1978). "Instead, [Appellant] merely outlines the issues that he subsequently presents in his points relied on and argument portions of his brief. This violation of the Rules is not condoned." *State ex rel. Mo. Highway and Transp. Comm'n v. Muegge*, 842 S.W.2d 192, 195 (Mo.App.1992). "This disregard of the rule would warrant an immediate and summary dispatch of the appeal.... Nevertheless, to quiet the cry of 'Technicality!' oft heard of appellate courts, we will consider plaintiffs' points on their merits where warranted." *Moore* at 861.

The Insured invokes Rule 84.04(d)(1)(B) and (C) by a motion to dismiss the appeal, asserting the brief of Insurer does not state the legal reasons for the claims of reversible error and why the reasons support the claim of reversible error. The requirement of that rule does not mandate that the Appellant shall prevail upon the

point. The points stated by the Insurer do invoke a legal principle, which has some plausible relationship to the record, and if found to be supported by the record would establish error. The motion to dismiss is denied. Insured's separate Motion for Sanctions for a Frivolous Appeal contains a rescript of the motion to dismiss and arguments supporting the Insured's position. That motion and Insurer's counter motion for sanctions under Rule 55.03 alleging the Insured's motions were for harassment are each denied.

The following is a distillation of part of the facts in the four-volume transcript to aid in placing Insurer's points in context. Insured was married to and engaged in business with Fred Nichols. They were married for over 25 years and divorced in 1988. By agreement she received no alimony but did receive some sporadic payments of $2000 or more upon the husband's indebtedness of an undisclosed amount and nature.

She lived in Eldon, Missouri, and had an antique and decorating business there, but outgrew the quarters. She then rented space in Red's Antique Mall and subsequently had a business relationship with one Edwards. When that terminated, Insured located an empty, dilapidated building in Osage Beach owned by Harry and Marsola Deuser. The building fronted on the highway and the upper floor was level with the highway. The building was on a slope and had a lower level or basement, the doors to which were at ground level. Insured rented only the upper floor and had no access to the lower level. The Deusers lived in their motel down the hill from this building.

Insured, at her expense, extensively remodeled and improved the rented portion. She opened for business in the fall of 1991. She had an extensive stock of antiques, artificial flowers, ribbons and other items for home decoration. She carried fresh flowers. In addition to temporary help, she employed Linda Vanhooser, a decorative designer. She and Vanhooser testified business was good and growing, citing commercial customers recently acquired. Insured's tax return for 1992 reflected the following figures: Gross sales $43,051; cost of goods sold $34,447; and expenses of $17,371; resulting in a loss of $8,767. The cost of goods sold was arrived at by using an opening inventory of $239,661, plus cost of labor of $12,921, for a total of $252,582, noting the inventory burned "10/10/92," and deducting $218,135 as the inventory at end of year.

Insured had a business policy that included liability and property damage coverage with Ansvar. She had called the agent who sold her the policy about some losses to fresh flowers, but received no satisfactory response. Another agency in the community that also represented Ansvar learned of Insured's dissatisfaction with the original agent. Agent Christiansen was sent to see Insured. He first completed a change of agent form. When he returned, he had obtained a copy of the declaration sheet of her policy and asked her if she knew she had only $25,000 in property damage coverage. She said she thought it was $50,000. They discussed her need for additional coverage. In a subsequent visit, Christiansen quoted various coverages and premiums to Insured. She initially continued the existing policy. In response to Insured's call, Christiansen returned and completed her application for $150,000 coverage. During the conversation Insured asked if there was coverage for arson. She gave him a down payment of $273, the monthly premium was to be $159. The coverage was increased to $160,000 at the suggestion of the underwriter, to meet the 80% requirement of the

represented value of $200,000. The new policy was effective October 8, 1992.

The business had outgrown the premises. The Insured made a down payment on the rent for a larger, empty building across the highway. A move was contemplated for the weekend following October 10, 1992, the night of the fire. Before the fire, Insured told Mrs. Deuser of the impending move and upon indicating she would like to use the building a bit longer, Mrs. Dueser said no, if she was going to move they wanted her out. Insured testified that Mrs. Dueser became very angry.

Insured has a son named Shannon Nichols. Shannon is deaf and speaks but little. Shannon lived in Kansas City. However, at the time of the fire he and his girlfriend Candy Ruppel were in Osage Beach to help Insured. Near the close of business on October 10, 1992, a customer came into the store and arranged for a statue to be decorated and delivered to his home that evening. Insured and Vanhooser prepared the statue and left the store about 7:30 p.m. Shannon and Candy stayed to clean up and close the store. It happened that the Fire Chief drove by the business about 9:00 p.m. and did not notice anything unusual. A fire call came in about 9:15 p.m.

At about 9:00 p.m., Insured and Vanhooser had arrived at a restaurant to eat. While there, by a telephone call, they learned the business was on fire. When they reached the store the volunteer firemen were there but had not entered the business. The front door, the only access, was locked. The fire was extinguished after substantial damage had been done to the building. The merchandise was reported to be a total loss.

The fire burned in two separate locations. The most extensive was at the back of the premises where it burned a hole through the floor. The other was near the front. There, a small burn area was initially obscured by debris. It was determined that the rear burn was the result of kerosene being poured on the carpet. The front burn was discovered upon an examination from the basement. It originated on the bottom side of the floor. The area had an odor of an accelerant. The doors to the basement were not secured. The night of the fire, Insured was taken to the police station and interviewed for several hours.

Shannon was married to Kelly Wood on March 9, 1987. They had a child. They separated on May 10, 1987, and Kelly lived in Potosi. She had custody of the child. However, as result of abuse by a relative while in Kelly's custody, the child, along with two other of Kelly's children, was placed in foster care. There was to be a hearing on the abuse allegations and Insured was to be a witness. The children were in foster care at the time of the fire.

Insured testified she had received threatening phone calls, including a threat "it would burn," and she wouldn't get back from the hearing alive. Kelly denied any threats to Insured.

Shannon's deposition was taken by the Insurer through a Certified Interpreter. It was read in evidence by the Insured while Shannon was in the Courtroom. His deposition included testimony that on the evening in question he had seen Kelly and a black man driving in the area of the business. Insured, subsequent to the fire, married Jim Highfill, but was divorced at the time of trial. He told Insured that he, too, had seen Kelly the night of the fire. Insured saw a black man, but did not see Kelly.

The Insurer requested an inventory from the Insured. Insured was under the impression the inventory was to be made from the debris. She and Vanhooser worked several weeks on such an invento-

ry. They were then advised that method of preparation was not necessary. During subsequent negotiations, Insured furnished various lists to the Insurer. On November 10, 1993, the Insured filed a proof of loss, using forms provided by the Insurer, accompanied by an invoice inventory which consisted of 15 pages and 1,323 entries and voluminous supporting documents. The inventory showed a total of $217,357.65. Further negotiations followed. On April 16, 1996, the Insurer formally denied the claim.

In addition to witnesses establishing the incendiary nature of the fire, the Insurer called Marsola Deuser, who testified that she did not set the fire. She said one of Insured's rent checks had bounced, although Insured "made it good," and that Insured was ten days behind in the rent at the time of the fire. Insurer offered Insured's tax return showing the loss. It subpoenaed Insured's CPA to produce records concerning the Insured. The subpoena was quashed. It also subpoenaed the records of the wholesale florist to show Insured was in debt to the florist. The subpoenaed witness did not appear.

 Three of the Insurer's points on appeal assert reversible error because the trial court excluded evidence. The principles applicable to the review of those three points include the following. "[T]he trial court has great discretion in the exclusion of evidence." *State Farm Mut. Auto. Ins. Co. v. DeCaigney*, 927 S.W.2d 907, 910 (Mo.App.1996). "The trial court's ruling will not be disturbed on appeal unless its ruling, considering the circumstances then confronting the trial court, is either so arbitrary or unreasonable that it shocks the sense of justice or is indicative of an absence of careful consideration." *Id.* at 910–11. " 'Refusal to admit evidence does not constitute reversible error unless it would have changed the result reached.' "

*Robertson v. Robertson*, 15 S.W.3d 407, 419 (Mo.App.2000) (quoting *Green v. Stanfill*, 641 S.W.2d 490, 492 (Mo.App.1982)). It is of no consequence that the court excluded evidence on an erroneous ground, where there exists a good ground for excluding it. *Franklin v. Friedrich*, 470 S.W.2d 474, 476 (Mo.1971).

The Insurer contends the trial court erred in not admitting testimony of Kelly Howard relating what Shannon Nichols communicated to her and in a later interview by a fire inspector concerning the fire. Kelly testified that about one month after the fire, while she and Shannon were on a trip from Kansas City, Shannon became upset. They communicated through sign and body language. Insurer proposed to ask Kelly if Shannon ever told her "whether he saw her and a black man in Lake Ozark that day." The Insured objected to a recitation of what Shannon communicated because it was hearsay and Kelly was not a certified interpreter. The court sustained the objection and said "I think she says [what] he says is hearsay, but I'm not going to allow it because she's not an interpreter." In an offer of proof, Kelly testified that they stopped along the road and Shannon said that "he knew about the fire and what was going on with the fire and *that's when* he requested that I contact a fire marshal, so he could talk to him." (Emphasis added.) Shannon communicated to her that he did not see Kelly and a black man in the area the night of the fire. When they reached Eldon, Kelly called fire investigator David Owens, who came to Kelly's mother's house and through Kelly interviewed Shannon. Shannon volunteered that he did not see Kelly.

Kelly testified that she had some training in sign language and she properly understood Shannon's communications. She was not a certified sign language interpret-

er. Insurer contends the law does not require that Kelly be certified and the hearsay was admissible to impeach the deposition testimony of Shannon that he saw Kelly and a black man in the vicinity of the business the night of the fire.

Neither of the parties cite a case or statute dealing with the certification of interpreters for the deaf. However, §§ 209.285 to 209.339, RSMo 1994, provide for the Certification and Licensing of Interpreters for the Deaf. Section 209.321, among other things, provides no person shall engage in the practice of interpreting as defined in the act unless licensed, but adds "[a] person is not considered to be interpreting pursuant to the provision of this section if, in a casual setting and as defined by rule, a person is acting as an interpreter gratuitously or is engaged in interpreting incidental to traveling."

Sections 161.400 to 161.407 establish the Missouri Commission for the Deaf. Section 161.405 charges the Commission to develop "a system of state certification for those individuals serving as interpreters of the deaf by: (a) Conducting evaluations...." Neither party has addressed the issue of whether or not these statutory provisions forbid or permit, or indeed authorize, the admission of interpretations such as Kelly's interpretation by sign and body language of communications with Shannon. That being so, as the resolution of this issue is not necessary for the disposition of this point, this case is not a proper vehicle for establishing a precedent on such an issue.

Insurer argues that Kelly's interpretation of Shannon's communication, even though hearsay, is admissible to impeach Shannon's deposition testimony. It does contradict that testimony. "There is authority that 'contradiction' is not synonymous with 'impeachment.'" *Reed v. Sale Mem'l Hosp. & Clinic,* 698 S.W.2d 931, 941 (Mo.App.1985). Even conceding that such communication would constitute impeachment, two principles bear upon its admission.

Kelly testified she was not in the vicinity at the time of the fire. The alleged communication corroborates that testimony. "The elementary rule which was violated is that a witness' testimony cannot be bolstered by hearsay evidence." 698 S.W.2d at 941. *See also* 33 Mo. Prac. § 620.2.

Further, Insurer took Shannon's deposition on November 12, 1999, and this testimony was offered at trial on December 3, 1999. He was not asked about the unexplained trip Kelly said the two were making from Kansas City during the period Kelly was living in Potosi. He was not asked if he made the alleged inconsistent statement.

It is of course, well settled that when a witness has testified to a material fact it is proper to admit evidence that he has previously made a statement relating to that fact which is inconsistent with his present testimony. A foundation must first be laid by asking the witness on cross-examination if he made the statement, and obtaining either denial or an answer the he failed to remember it.

*State v. Vaughn,* 501 S.W.2d 839, 842 (Mo. banc.1973). Shannon was asked, "[h]ave you ever talked or discussed the fire with Kelly?" He answered, "[n]o." This is not the required foundation.

In order to impeach a witness with a prior inconsistent statement, it is axiomatic that a proper foundation must be laid. The witness must be given a chance to refresh his recollection of the prior statement and to admit, deny, or explain it. To lay the requisite foundation, it is necessary to ask the witness whether he made the statement. It is essential to quote the prior statement

and to point out the precise circumstances under which it was made.

*Johnson v. National Super Markets, Inc.,* 752 S.W.2d 809, 812 (Mo.App.1988) (citations omitted). *See also Aliff v. Cody,* 26 S.W.3d 309, 319 (Mo.App.2000). The trial court did not err in refusing to admit the testimony of Kelly's interpretation of Shannon's alleged communication.

■ By another point, Insurer contends the trial court committed reversible error by excluding the testimony of Mike Christiansen (the agent who increased the insurance coverage) concerning Insured's counsel's advice to him that, as he lived out of the county of trial, he might not have to appear at the trial. In a hearing concerning the admissibility of the testimony, Insured's counsel said that she called to see if he was the Mike Christiansen (he was only in the insurance business a short time and was then in the real estate business) referred to in the case file. He replied that he really didn't remember much, and that he had made a statement. He had not thought of anything that would change his statement. He added that he had been subpoenaed and really didn't want to go. She advised that she thought because the trial was out of the county he might not have to go but that she would have to check. He replied that he was going anyway.

The trial court said, "I'm going to disallow it. It may be—it may be—an ethical complaint. It may be inappropriate on Ms.—what—Clark's part to do it, but ... I think ... whatever relevant value it has is greatly outweighed by the prejudicial value of it." Mike Christianson was a witness, not a party. Any probative value of Ms. Clark's call to intimate, as Insurer contends, Insured started the arson fire, would have been minimal. The testimony would have introduced a collateral issue into the case. "Where evidence is exclud-ed, the issue is whether the trial court abused is discretion, not whether the evidence was admissible." *Envtl. Waste Mgmt., Inc. v. Indus. Excavating & Equip., Inc.,* 981 S.W.2d 607, 613 (Mo.App. 1998) (quoting *Howe v. ALD Servs., Inc.,* 941 S.W.2d 645, 654 (Mo.App.1997)). *See also Lewis v. Wahl,* 842 S.W.2d 82, 85 (Mo.banc 1992), and *Green v. Stanfill,* 641 S.W.2d 490, 492 (Mo.App.1982). The trial court did not abuse its discretion by excluding this testimony.

■ By a subsequent point, Insurer says the trial court committed reversible error in not admitting the testimony and report of Fire Inspector Lassiter concerning Insured's indebtedness to Bob Mears Wholesale Florist Shop. Dewayne Lassiter, an investigator with the State Fire Marshall's Office, testified that on January 8, 1993, he interviewed Debra McAdoo, business manager of Bob Mears Wholesale Florist Shop, concerning any indebtedness of Insured to that business. In his examination he was asked, "what did Ms. McAdoo tell you?" An objection that a response would be hearsay was sustained. In an offer of proof, the Insurer offered one page of Lasiter's report in which Lassiter reported that Ms. McAdoo said, among other things, that Insured, at the time of the fire, was indebted approximately $1,100, she had received an insufficient funds check and started having problems with Insured's account about three months before the fire.

In its brief Insurer does not support that part of its point asserting that sustaining the objection to the question of what the fire inspector was told was error. It does argue that excluding the report was error. It first asserts it was admissible because it was an "official report." The official report exception to the hearsay objection has been stated in the following terms. "There is a well-established excep-

tion to the hearsay rule admitting official reports made by an officer on the basis of his *own personal* investigation and *knowledge*, at least when required by statute, ordinance, rule or regulation." *Capra v. Phillips Inv. Co.*, 302 S.W.2d 924, 936 (Mo. banc 1957) (emphasis added). The decisions limiting the admissibility of what was told to an officer under The Uniform Business Records as Evidence Law, §§ 490.660 to 490.690, RSMo 1994, are applicable to reports that qualify as "official reports."

In support of its position Insurer cites *Snider v. Wimberly*, 357 Mo. 491, 209 S.W.2d 239 (1948), in which a statement of a declarant to an officer that "he thought the prowler was an ex-employee by the name of Carl Elvin Snider" was held admissible. This case does not aid the Insurer's position, but points up why what Ms. McAdoo said as related in the report is not admissible. *Snider* was an action for false arrest growing out of the statement. The issue was whether or not the statement was made (the officer had personal knowledge that it was made) and it was not offered for the truth of the statement. In this case, Insurer offered the report to establish the truth of the hearsay that Insured was indebted.

*Snider* was distinguished in *Kansas City Stock Yards Co. v. A. Reich & Sons*, 250 S.W.2d 692 (Mo.1952), *overruled in part on other grounds by Gateway Chemical Co. v. Groves*, 338 S.W.2d 83 (Mo.1960), in which that portion of a fire report which said the cause of fire was the "careless use of welding torch" was held inadmissible because it reflected what the officer had been told. "Clearly, the notation in the report was a conclusion based upon hearsay twice removed." *Id.* at 700.

The Insurer alternatively contends the report is admissible by reason of The Uniform Business Records as Evidence Law. §§ 490.660 to 490.690. The inspector's re-

port is of an interview approximately three months after the fire with an alleged creditor of the Insured. "Accident reports ... and other records made at a later time are often held to be inadmissible on the grounds that they are neither regular nor timely." 33 Mo. Prac. § 803(6).3 at 441. It is not necessary to determine if the requirement of the statute that the record be made "at or near the time of the act, condition or event" refers to the fire, the credit status of Insured, or the interview by the inspector.

Even if the report could be considered a "business record," that does not cause the statements and records of the alleged creditor to be admissible. "But all the Act does is eliminate the hearsay objection to the report itself '... it does not make admissible any evidence which would be incompetent if offered in person.'" *Nash v. Sauerberger*, 629 S.W.2d 491, 492 (Mo. App.1981) (quoting *Ryan v. Campbell "66" Express*, 304 S.W.2d 825, 828 (Mo.banc 1957)). A similar issue was presented in *Nelson v. Holley*, 623 S.W.2d 604 (Mo.App. 1981), in which the written statement of witness Hall was attached to the report of an officer investigating a traffic accident. "The officer's report of the accident met the requirements for admission as a business record ... but that does not make all the contents of such report admissible. The Hall statement contained therein, inadmissible as hearsay, did not become admissible because contained in a business record." *Id.* at 607. *See also State v. Chapman*, 724 S.W.2d 713 (Mo.App.1987). The trial court did not err in excluding the hearsay evidence of what the fire inspector said in his report the wholesale florist said of the Insured's credit history.

■ Another point asserted by Insurer is that the trial court erred in quashing a subpoena duces tecum served upon the Insured's certified public accountant to

produce all financial documents relating to Insured and all documents prepared by anybody else that the accountant relied upon in preparing any work concerning the insured, all for the years 1990 through and including 1998. The arguments of counsel center upon the issue of whether or not the fact Insured's petition originally sought recovery under the lost profits coverage of the policy waived the certified public accountant privilege provided by § 326.151, even though the Insured dismissed that prayer before the motion was heard. This issue need not be decided.

The statute which authorized such a subpoena also provided that the court may "quash the subpoena if it is unreasonable and oppressive." § 491.100.3, RSMo 1994. "The determination of reasonableness of the requirement to produce documents rests within the sound discretion of the trial court." *State ex rel. Rowland Group, Inc. v. Koehr*, 831 S.W.2d 930, 933 (Mo. banc 1992). The subpoena was served on November 30, 1992, for the accountant's appearance on December 3, 1992. The Insured's motion to quash was heard on December 2, 1992, before trial commenced. The difficulty in assembling such a host of documents in such a short period of time is not the only factor bearing upon the issue of reasonableness. The lost profits coverage limited a recovery to any loss during the 12 months following the fire. The relevance of such a multitude of documents for six years after the fire is not explained. The trial court sagaciously observed "that it is too late in the day to be subpoenaing all the records at the last minute without any prior subpoenas or anything, so I'm going to sustain the motions to quash." This determination of unreasonableness was not an abuse of discretion. *Compare Coble v. Coble*, 931 S.W.2d 206 (Mo.App. 1996). The point is denied.

■■■ In its next point the Insurer contends the trial court erred in not granting a requested continuance or mistrial, because the records custodian of Riverbridge Mini Storage did not appear and produce records concerning alleged indebtedness of Insured to that company. Rules 65.03 and 65.04 prescribe how an application for a continuance is to be made and the contents thereof. Conceding, without holding, that Rule 65.03 requiring a written application is not applicable to an oral motion for continuance made upon the nonappearance of a subpoenaed witness, Rule 65.04 is applicable. *Smith v. Smith*, 952 S.W.2d 771 (Mo.App.1997). The Insurer argues that because its oral motion complied with Rule 65.04, the trial court erred in not granting a continuance. This argument misconceives the effect of compliance with those rules. Even though such a motion complies with those rules, whether or not a continuance is to be granted is within the discretion of the trial court. *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 207 (Mo.banc 1991).

The oral motion was made upon the close of the Insurer's case on the second day of trial at approximately 9:00 p.m. It is obvious an effort had been made to finish the case in two days. Before trial an attorney for Riverbridge had faxed Insurer's counsel 23 pages of records and filed a motion to quash the subpoena. That motion was not called up. In looking at the records provided by fax, the Court observed:

Okay. The court will note that somewhere we had a conference like on Wednesday afternoon and we received a motion to quash this subpoena. I believe, faxed in [by] some attorney representing this outfit. And that motion was never called up by you or anyone else, and it is now 9:15 on Friday night after two days—hard days of trial, and your mo-

tion to continue the trial and your motion for a mistrial is denied.

In response to the court's question, Insurer's counsel declined to state the amount of indebtedness the records would show and said the documents would speak for themselves. The court examined the faxed records and observed, "I think in the scheme of things three or four hundred dollars in arrearage is not a significant amount of money that would be show significant prejudice."

■■■ "The granting or denying of a continuance rests in the sound discretion of the tribunal and will not be disturbed on appeal in the absence of a showing of abuse of that discretion." *Moore v. Board of Educ. of Fulton Public School No. 58,* 836 S.W.2d 943, 948 (Mo.banc 1992). An appellate court will reverse a trial court's denial of a motion for continuance only when an abuse of discretion is found. *Wright v. Price,* 871 S.W.2d 12, 14 (Mo. App.1993). "The trial court's decision concerning a continuance will be disturbed only in extreme cases where it clearly appears that the moving party is free of any dereliction." *Lakepoint Condo. 2 Owners Ass'n, Inc. v. Durian,* 906 S.W.2d 396, 399–400 (Mo.App.1995). In view of the circumstances, the trial court did not abuse its discretion in denying the motion for continuance or a mistrial. *See Seabaugh,* 816 S.W.2d at 207–08.

By a subsequent point the Insurer asserts that the cumulative prejudicial effect of the trial court's errors requires a reversal of the judgment and remand for a new trial. "Because we have found no error on the part of the trial court, there consequently can be no cumulative error on which to base a reversal and remand for new trial." *Bowman v. McDonald's Corp.,* 916 S.W.2d 270, 284 (Mo.App.1995).

■■■ By its last point, Insurer contends the trial court erred in awarding prejudg-

ment interest from the date the proof of loss was filed with the Insurer. "The general rule is a policy holder is entitled to interest from the date the claim became payable under the policy." *Huffstutter v. Michigan Mut. Ins. Co.,* 778 S.W.2d 391, 394 (Mo.App.1989). By argument, the Insurer contends that no prejudgment interest should have been allowed because the policy does not provide for a due date and because the Insured did not comply with the conditions, such as the requirements to submit to an examination under oath and to cooperate.

■■■ The status of such conditions in a bilateral contract of insurance is somewhat anomalous.

The duty imposed upon an insured to plead compliance with a condition precedent of a policy of insurance in order to state a cause of action against an insurer under a policy ... is somewhat difficult to reconcile with an extant line of cases which hold that non-compliance with certain conditions precedent contained in a policy of insurance does not defeat recovery under a policy unless the insurer is prejudiced thereby and, if so, the issue of prejudice takes on characteristics of an affirmative defense which the insurer must shoulder the burden of proving.

*Pannell v. Missouri Ins. Guaranty Ass'n,* 595 S.W.2d 339, 347 (Mo.App.1980). In spite of this anomaly, the treatment accorded such conditions is well established. The insured must plead compliance with the policy conditions, but may do so generally. Rule 55.16. *See State ex rel. MFA Ins. Co. v. Murphy,* 606 S.W.2d 661 (Mo. banc 1980).

■■■ The failure of the insured to comply with a condition is an affirmative defense which the Insurer must plead. "A denial of performance or occurrence shall

be made specifically and with particularity." Rule 55.16. *See Calvert v. Safeco Ins. Co. of America*, 660 S.W.2d 265, 270 (Mo.App.1983). The insurer bears the burden of proof on such an affirmative defense, including the issue of prejudice. *Tresner v. State Farm Ins. Co.*, 913 S.W.2d 7 (Mo.banc 1995). See MAI 31.09 [1978 New] Verdict Directing—Insurance Policy on Property; MAI 32.24 [1978 New] Affirmative Defenses—Insurance Policy Defense; and MAI 3.01 [1998 Revision] Burden of Proof—General. The issue of whether or not the insured complied with such conditions has been resolved in the Insured's favor by the pleadings, instructions and trial in this case. *See McNeal v. Manchester Ins. & Indem. Co.*, 540 S.W.2d 113, 121 (Mo.App.1976).

■ Nor is this contention concerning prejudgment interest supported by the argument "the loss was unliquidated and undeterminable," as the damages could be determined by an established measure of damages. *See Bolivar Insulation v. R. Logsdon Builders*, 929 S.W.2d 232 (Mo. App.1996).

Insurer bases an alternative argument upon policy Section 6 *Loss Payment a.*, which gives the Insurer four options to pay the value or cost or repair or replace and *b.* which provides "We will give notice of our intention within 30 days after we received the proof of loss." Insurer argues this does not provide when the proceeds are due and therefore no interest accrues until judgment. On the other hand, the Insured seizes upon this clause and argues that since there is no due date, prejudgment interest accrued from the date of loss.

The parties have ignored subsection *g.* under Section 6 which provides: "We will pay for covered loss or damage within 30 days after we receive the sworn statement of loss, if:

(1) You have complied with all of the terms of this policy; and

(2) (a) We have reached agreement with you on the amount of loss or

(b) An appraisal award has been made."

This issue of the Insured's compliance with the terms of the policy has been resolved as discussed above. Subsection (2) is based upon a provision in the policy form that if the parties do not agree upon the amount due, there will be an appraisal. The Missouri Changes endorsement to the policy form replaces this requirement with a provision that there will be an appraisal if "both parties so agree." This obviates the requirement of subsection (2).

■ The policy by § 6 *g.* provides the proceeds are due 30 days after the proof of loss was submitted. Prejudgment interest should have been calculated from November 10, 1993. The cause is remanded to the trial court with directions to recalculate the prejudgment interest and amend the judgment accordingly. *See St. Louis County Nat'l Bank v. Maryland Cas. Co.*, 564 S.W.2d 920, 930 (Mo.App.1978); *In re Marriage of Dooly*, 994 S.W.2d 98, 99 (Mo. App.1999).

The judgment as so amended is affirmed.

PREWITT, J., and BARNEY, C.J., concur.